**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

ELLIS DOUGLAS,

                    Plaintiff,

        v.                                            No. 05-CV-1000
                                                   (LEK/DRH)

JOSEPH T. SMITH, Superintendent,
Shawangunk Correctional Facility; J. RAE,
Sergeant; M. KETZER, Corr. Officer; R.
CROSS, Corr. Officer; G. KARASMANOS,
Corr. Officer; M. SUTTON, Corr. Officer; R.
DAVIES, Corr. Officer; McGUIRE, Corr.
Officer; and R.N. SKIES, Nurse,

                    Defendants.

_____

**APPEARANCES:**                          **OF COUNSEL:**

ELLIS DOUGLAS
Plaintiff Pro Se
97-A-3334
Southport Correctional Facility
Post Office Box 2000
Pine City, New York 14871

HON. ANDREW M. CUOMO           JEFFREY P. MANS, ESQ.
Attorney General for the               Assistant Attorney General
  State of New York
Attorney for Defendants
The Capitol
Albany, New York 12224-0341

**DAVID R. HOMER**
**U.S. MAGISTRATE JUDGE**

**REPORT-RECOMMENDATION AND ORDER**[1]

    Plaintiff pro se Ellis Douglas ("Douglas"), an inmate in the custody of the New York State

_____

    [1]This matter was referred to the undersigned for report and recommendation
pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

Department of Correctional Services ("DOCS"), brings this action pursuant to 42 U.S.C. §

1983 alleging that defendants, nine DOCS employees, violated his constitutional rights

under the First, Fourth, Eighth, and Fourteenth Amendments.  Compl. (Docket No. 1).

Presently pending is defendants' motion for summary judgment pursuant to Fed. R. Civ. P.

56.  Docket No. 41.[2]  Douglas opposes the motion.  Docket No. 49.  For the following

reasons, it is recommended that defendants' motion be granted in part and denied in part.


### I. Background

The facts are related herein in the light most favorable to Douglas as the nonmoving

party.  See subsection II(A) infra.

On June 30, 2004, on the way back to his cell, Douglas and defendants Rae, Ketzer,

and Cross were involved in an altercation.  Compl. at ¶ 14, 17-18; Docket No. 41,

attachment 4.  Douglas claims that while he was in restraints, these defendants assaulted

him by "stomp[ing] on [his] arms, face, head and back," causing injuries which included a

swollen neck, forehead and ear, temporary hearing difficulties, sore ribs, and labored

breathing.  Docket No. 41, attachment 4 at 3; Douglas Dep. (Docket No. 41, attachment 11)

at 78.  Douglas also contends that following this altercation, defendant Davies kneed him in

---

[2]It appears from the docket that defendant R. Davies has never been served with
process or otherwise appeared in the action.  See Docket No. 23 (summons returned
unexecuted); see also Docket Nos. 18, 19, 21, 39 (answers filed for ll defendants except
Davies).  Defendants' motion is brought on behalf of defendants generally without
specifying those defendants by name.  See Defs. Notice of Motion (Docket No. 41, pt. 1) &
Defs. Mem. of Law (Docket No. 41, pt. 17).  It is thus unclear whether defendants' motion
purports to includes Davies.  However, this issue need not be resolved because under
Fed. R. Civ. P. 4(m), service of process upon Davies was not completed within the 120
days allowed by the rule and the complaint as to him should be dismissed without
prejudice for that reason.

the forehead in his cell prior to escorting him to receive medical attention for the aforementioned altercation.  Douglas Dep. at 71.

Upon arriving at the infirmary, Douglas "complained of injuries to his forehead, and pain in the right elbow and left shoulder."  Skies Aff. (Docket No. 41, attachment 8) at ¶ 5; Docket No. 41, attachment 12 at 6.  Defendant Skies, a nurse, examined Douglas, noting that he "was orientated, had a full range of motion of all extremities, [had] no loss of consciousness, . . , pupils were equal and reactive to light," and he had "superficial" injuries consisting of "bruises with slight edema (swelling); . . . abrasions across [the] forehead; small scratches to . . . [the] right cheek in two places; a 1 ½ inch scratch [on the] . . . right forearm and right index finger; [and] superficial scratches across the front and back of [the] neck."  Skies Aff. at ¶ 5; Docket No. 41, attachment 12 at 6,7.  Skies cleaned the scratches, applied band-aids, provided Douglas with an ice pack, and recommended a follow-up examination for the following day.  Skies Aff. at ¶ 5.  Photographs were taken of Douglas' injuries while he was being examined.  Docket No. 41, attachment 12 at 25-44.

For the following two weeks, Douglas continued to complain of headaches and pain in his back.  He received a medical consult and pain relievers.  Douglas Dep. at 79-80.  No further complaints of swelling and hearing loss were made and Douglas next complained of sore ribs and labored breathing in January 2005.  Douglas Dep. at 80.  Douglas informally requested mental health services for psychological trauma from the altercation via conversations with therapists visiting the facility where he was housed; however, each medical professional he spoke with told him that he did not need mental health services.  Id. at 80-82.

As a result of the June 30th altercation, Douglas was issued a misbehavior report

3

charging that he assaulted a staff member.  Docket No. 41, attachment 12 at 19-20.  In

response, Douglas filed a grievance claiming harassment.  Docket No. 41, attachment 4 at

1-4.  After an investigation, Douglas' grievance was denied because there was "[n]othing to

substantiate staff misconduct."  Id. at 4.  Douglas attempted to appeal the denial claiming

excessive force but to no avail.  Sadiq Aff. (Docket No. 49) at 18.  Additionally, Douglas was

charged criminally with assaulting a corrections officer, "pleaded guilty to the reduced

charge of attempted assault . . . , and was sentenced as a second felony offender in

accordance with the plea agreement to a prison term of 2 to 4 years, to be served

consecutively to a sentence he was then serving."  People v. Douglas, 831 N.Y.S.2d 585

(3d Dep't 2007).

On August 30, 2004, again while returning to his cell, Douglas was assaulted by

defendants Davies, Sutton, Karasnanos, McGuire, and Ketzer.  Compl. at ¶ 19.  According

to Douglas, "he was stomped, kicked, punched and dragged into his cell . . . ."  Docket No.

41, attachment 5 at 1.  Douglas received medical attention complaining that his "head, . .

back, . . wrist, . . shoulder and . . . face" were injured and received ice and pain relievers.

Douglas Dep. at 128; Skies Aff. at ¶ 7.  Skies noted that Douglas had "full range of motion

to all extremities" and sustained a "bruise on the left cheek with [a] superficial abrasion, red

area to [the] left shoulder, [and] scratch[es] to [the] left forearm [and] left side of [the] lower

leg."  Docket No. 41, attachment 13 at 1.  Skies concluded that the injuries were superficial,

cleaned the abrasions, and provided an ice pack.  Id. at 1, 3; Skies Aff. at ¶ 8.  Additionally,

photographs were taken of Douglas' injuries while he was being examined.  Docket No. 41,

attachment 13 at 15-31.

The next morning, Douglas was seen by medical staff for complaints of pain on the top

4

of his head and the feel of caked blood.  Douglas Dep. at 128; Skies Aff. at ¶ 9.  "Upon

examination, it was noted that he was alert, oriented and his gait was normal . . . ."  Skies

Aff. at ¶ 9.  Douglas was given pain medication and "a small abrasion [was noted] . . . on his

head, as well as some various minor abrasions, scratches, swelling, bruises, and

tenderness about his head, face, left arm, lower ribs, and wrists."  Id.  A few days later,

Douglas was again examined by medical staff and who found that "his abrasion was

healing, . . . he had ambulated to the office and appeared normal, . . . his blood pressure

was within normal limits, and . . . he otherwise presented with no injuries or symptoms

requiring any further medical care or treatment at that time."  Id.  However, Douglas still

suffered from shoulder pain, self-diagnosed as "a rotary [sic] cuff problem" which will

probably require surgery.  Douglas Dep. at 133-34.  No further complaints were noted in

Douglas' health records concerning the aforementioned ailments.  Skies Aff. at ¶ 10.

    Douglas also filed a grievance concerning the alleged assault on August 30, 2004.

Docket No. 41, attachment 5 at 1.  After an investigation which included interviewing

Douglas and the individuals he identified as witnesses, it was concluded that "based on

[Douglas'] minor injuries in no way being consistent with the beating claimed, the

inconsistencies in the inmate witness accounts of the incident as well as [Douglas'] own

lapses in the story . . . the [defendants'] version is reasonable and accurate" and the

grievance was denied.  Id. at 1, 2-3.  Douglas attempted to appeal the denial but to no avail.

Sadiq Aff. at 18.

    On or about October 28, 2004, defendant Rae intercepted and read a letter Douglas

wrote on behalf of another inmate.[3]  Compl. at ¶ 22; Docket No. 41, attachment 7 at 3.

Douglas filed a grievance concerning the incident.  Docket No. 41, attachment 7.  During

the investigation, Douglas refused to disclose the source that apprised him his mail was

being opened.  Id. at 7.[4]  Douglas demanded that Rae be "removed from around [him]

before a situation ar[ose] where [he was] forced to protect [him]self . . ." and he receive "all

documents as to why [he was] on mail watch . . . ."  Docket No. 41, attachment 7 at 4.  The

grievance and appeal were both denied because there was not "sufficient evidence to

substantiate any malfeasance by staff."  Id. at 1.

On July 26, 2005, Douglas filed another grievance concerning the sanitary conditions of

the Special Housing Unit (SHU)[5] where he was housed.  Docket No. 41, attachment 6.

---

[3]"[A]fter Douglas' . . . June 30, 2004 [altercation with] . . . Rae, [Douglas] was
placed on a mail watch from July 1, 2004, to September 28, 2006, in an attempt to
investigate whether the June 30th [altercation] . . . was . . . planned . . ., whether it was
possibly gang affiliated, and whether other [altercations with] . . . staff might be
anticipated."  Smith Aff. (Docket No. 41, attachment 3) at ¶ 9.  Therefore, Douglas' mail
was being screened but Deputy Superintendent of Security John Maly, who was
responsible for the mail watch.  Id.  Douglas claimed that he should have been apprised of
the pending mail watch and denial of such notice amounted to a constitutional violation.
Docket No. 41, attachment 7 at 3.

[4]However, at his deposition Douglas testified that Corey Ford informed him that
during Ford's trial, the Dutchess County District Attorney attempted to proffer information
contained in Douglas' letter, which only could have been discovered if a copy of his letter
was provided to the District Attorney.  Douglas Depo. at 139-40.

[5]SHUs exist in all maximum and certain medium security facilities.  The units
"consist of single-occupancy cells grouped so as to provide separation from the   general
population . . . ."  N.Y. Comp. Codes R. & Regs. tit. 7, § 300.2(b) (2007). Inmates are
confined in a SHU as discipline, pending resolution of misconduct
charges, for administrative or security reasons, or in other circumstances as
required.  Id. at pt. 301.

Douglas suffers from , sarcoidosis[6], a respiratory condition requiring adequate ventilation. Id.; Compl. at ¶ 25.  Douglas received medical attention in May 2005, where staff found "his lungs . . . clear, no wheezing was present, there were no signs of respiratory distress, and his vital signs were normal, and he was seen by a doctor . . . ."  Skies Aff. at ¶ 11. Additionally, Douglas was "provided treatment by a pulmonary specialist . . ." and "made no further complaints to medical staff regarding same thereafter, up to and including October 11, 2005 . . . ."  Id.  However, due to the inadequate cleaning of the vents and light fixtures, Douglas regularly suffered from labored breathing, wheezing, and eye irritation.  Compl. at ¶¶ 25-26.  The grievance was denied because the SHU was "being cleaned according to the cleaning schedule . . . ."  Docket No. 41, attachment 6 at 1.


## II. Discussion

In his complaint, Douglas alleges four claims.  The first is that his mail was tampered with in violation of the First Amendment.  The next, construing Douglas' claims liberally, contends that his mail was illegally searched in violation of his First and Fourth Amendment rights.  Douglas also alleges Eighth Amendment claims for being subjected to excessive force during transport to and from his cell and deliberate indifference to his medical needs. Lastly, Douglas claims that he has been deprived of his Fourteenth Amendment right to due process and his First Amendment right to be free from retaliation when he was issued false

---

[6] Sarcoidosis is an inflammatory disease that "can attack any organ of the body . . . [b]ut . . . is most frequently found in the lungs."  See Am. Lung Ass'n (visited Jan. 17, 2008) <http://www.lungusa.org/site/pp. asp?c=dvLUK9O0E&b=35766>.  "The disease is characterized by the presence of . . . small areas of inflamed cells" and, in the lungs, it "can cause loss of lung volume and abnormal lung stiffness."  Id.

disciplinary charges.  Defendants move for summary judgment as to all claims.

## A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Facts are material if they may affect the outcome of the case as determined by substantive law.  Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).  All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. Gallo v. Prudential Residential Servs. 22 F.3d 1219, 1223-24 (2d Cir. 1994); Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1988).

When, as here, a party seeks summary judgment against a pro se litigant, a court must afford the non-movant special solicitude.  Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006).  However, the mere existence of some alleged factual dispute

between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.  Anderson, 477 U.S. at 247-48.

## B. Exhaustion

As a threshold matter, defendants contend that Douglas has failed to exhaust his administrative remedies.  Under 42 U.S.C. § 1997e(a), an inmate must exhaust all administrative remedies prior to bringing any suits challenging prison conditions, including federal civil rights cases.  Porter v. Nussle, 534 U.S. 516, 524 (2002); see also Woodford v. Ngo, 126 S. Ct. 2378, 2382-83 (2006).  This exhaustion requirement applies to all prison condition claims.  Porter, 534 U.S. at 532.  "[A]ny deprivation that does not affect the fact or duration of a prisoner's overall confinement is necessarily a condition of that confinement." Jenkins v. Haubert, 179 F.3d 19, 28 (2d Cir. 1999). The exhaustion requirement also applies even if the administrative grievance process does not provide for all the relief requested by the inmate.  Nussle, 534 U.S. at 524.

While the Supreme Court has deemed exhaustion mandatory, the Second Circuit has recognized that "certain caveats apply."  Ruggiero v. County of Orange, 467 F.3d 170, 175 (2d Cir. 2006) (citing Giano v. Goord, 380 F.3d 670, 677 (2d Cir. 2004)).  Exhaustion is generally achieved through the Inmate Grievance Program (IGP).[7]  See N.Y.Comp. Codes

---

[7] "The IGP is a three-step process that requires an inmate to: (1) file a grievance with the IGRC [Inmate Grievance Resolution Committee]; (2) appeal to the superintendent within four working days of receiving the IGRC's written response, and (3) appeal to the CORC [Central Office Review Committee] . . . within four working days of receipt of the superintendent's written response."  Abney v. McGinnis, 380 F.3d 663, 668 (2d Cir. 2004) (internal citations omitted).

R. & Regs. tit. 7, § 701.1 et seq. (2001).  However, when inmates fail to follow the IGP, a court must conduct a three-part inquiry to determine if such failure is fatal to their claims.  A court must consider whether

> (1) administrative remedies are not available to the prisoner; (2) defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; or (3) special circumstances, such as a reasonable misunderstanding of the grievance procedures, justify the prisoner's failure to comply with the exhaustion requirement.

Ruggiero, 467 F.3d at 175 (citing Hemphill v. New York, 380 F.3d 680, 686 (2d Cir. 2004)).

Administrative remedies are unavailable when there is no "possibility of [] relief for the action complained of."  Abney v. McGinnis, 380 F.3d 663, 667 (2d Cir. 2004) (citing Booth v. Churner, 532 U.S. 731, 738 (2001)).  The test to determine the availability of an administrative remedy is an objective one asking whether "a similarly situated individual of ordinary firmness" would have deemed it accessible.  Id. at 688.  Courts have found unavailability "where plaintiff is unaware of the grievance procedures or did not understand it or where defendants' behavior prevents plaintiff from seeking administrative remedies." Hargrove v. Riley, No. CV-04-4587 (DST), 2007 WL 389003, at *8 (E.D.N.Y. 2007) (internal citations omitted).

Here, Douglas testified that he was extremely familiar with the grievance program and its appeals process.  Douglas Dep. at 84-86.  Defendants contend that, in light of Douglas' extensive knowledge of the IGP, he failed fully to exhaust his remedies by failing to appeal or initially file a grievance for all claims except those relating to the alleged mail tampering. Defs. Memo. of Law (Docket No. 41, attachment 17) at 14-15.

According to a supporting affidavit, Douglas did in fact appeal one of his excessive force claims to CORC.  Sadiq Aff. at 18.  Because the affidavit does not specify which of the two

10

excessive force grievances was appealed, Douglas must be given the benefit of the doubt on both and both should be deemed exhausted.  See subsection II(A) supra.

Additionally, Douglas filed a motion "contend[ing] that defendants harassed, intimidated, abused authority and retaliated in a revengeful manner against [Douglas]."  Docket No. 49 at ¶ 9-11.  Although Douglas was well aware of the IGP, construing the facts in the light most favorable to Douglas would support his contention that officers were interfering with his mail and that the motion was made in an attempt to exhaust administrative remedies, albeit through a different forum.  Id. at ¶ 11.  Thus, these special circumstances would compel a finding that the exhaustion requirement for his retaliation and due process claims were satisfied through alternate means.

Douglas also testified that he appealed the denial of his grievance concerning the sanitary conditions in SHU.  Douglas Dep. at 147.  However, defendants contend that there is no record of a further appeal on file at Shawangunk or DOCS' CORC.  Smith Aff. (Docket No. 41, attachment 3) at  ¶ 8.  Despite the lack of physical record, viewing the facts in the light most favorable to Douglas again compels the conclusion that the appeals were filed and misplaced or destroyed.

Therefore, defendants' motion for summary judgment on this ground should be denied.


## C. Eighth Amendment

Douglas contends that defendants subjected him to excessive force and then were deliberately indifferent to his resulting medical needs.  Defendants disagree on both accounts.  The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment."  U.S. CONST. amend. VIII.  This includes the provision of medical care and

11

punishments involving "the unnecessary and wanton infliction of pain." Hathaway v.

Coughlin, 37 F.3d 63, 66 (2d Cir. 1994) (citations omitted).


## 1. Medical Care

A prisoner advancing an Eighth Amendment claim for denial of medical care must allege

and prove deliberate indifference to a serious medical need. Wilson v. Seiter, 501 U.S.

294, 297 (1991); Hathaway, 37 F.3d at 66.  More than negligence is required "but less than

conduct undertaken for the very purpose of causing harm." Hathaway, 37 F.3d at 66.  The

test for a § 1983 claim is twofold.  First, the prisoner must show that there was a sufficiently

serious medical need. Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998).  Second,

the prisoner must show that the prison official demonstrated deliberate indifference by

having knowledge of the risk and failing to take measures to avoid the harm. Id.  "[P]rison

officials who actually knew of a substantial risk to inmate health or safety may be found free

from liability if they responded reasonably to the risk, even if the harm ultimately was not

averted." Farmer v. Brennan, 511 U.S. 825, 844 (1994).

"'Because society does not expect that prisoners will have unqualified access to

healthcare', a prisoner must first make [a] threshold showing of serious illness or injury" to

state a cognizable claim. Smith v. Carpenter, 316 F.3d 178, 184 (2d Cir. 2003)(quoting

Hudson v. McMillian, 503 U.S. 1,9 (1992)).  Because there is no distinct litmus test, a

serious medical condition is determined by factors such as "(1) whether a reasonable doctor

or patient would perceive the medical need in question as 'important and worthy of

comment or treatment,' (2) whether the medical condition significantly affects daily

activities, and (3) the existence of chronic and substantial pain." Brock v. Wright, 315 F.3d

158, 162-63 (2d Cir. 2003)(citing <u>Chance</u>, 143 F.3d at 702).  The severity of the denial of

care should also be judged within the context of the surrounding facts and circumstances of

the case.  <u>Smith</u>, 316 F.3d at 185.

Deliberate indifference requires the prisoner "to prove that the prison official knew of and

disregarded the prisoner's serious medical needs."  <u>Chance</u>, 143 F.3d at 702.  Thus, prison

officials must be "intentionally denying or delaying access to medical care or intentionally

interfering with the treatment once prescribed."  <u>Estelle v. Gamble</u>, 429 U.S. 97, 104,

(1976).  "Mere disagreement over proper treatment does not create a constitutional claim,"

as long as the treatment was adequate.  <u>Id.</u> at 703.  Thus, "disagreements over medications,

diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for

specialists . . .  are not adequate grounds for a § 1983 claim."  <u>Magee v. Childs</u>, No. 04-CV-

1089 (GLS/RFT), 2006 WL 681223, at *4 (N.D.N.Y. Feb. 27, 2006).  Furthermore,

allegations of negligence or malpractice do not constitute deliberate indifference unless the

malpractice involved culpable recklessness.  <u>Hathaway v. Coughlin</u>, 99 F.3d 550, 553 (2d

Cir. 1996).

## I. June 30th Altercation

Douglas claims that defendants were deliberately indifferent to the serious medical

needs after the June 30th altercation.  Douglas' injuries included a swollen neck, forehead,

and ear, temporary hearing difficulties, sore ribs, and labored breathing.  Defendants

contend that there was no deliberate indifference.

As to the first prong, Douglas may have offered evidence sufficient to satisfy the

standard that his injuries were serious medical needs.  Considering his injuries together, the

lacerations, bruises, swelling, and temporary hearing loss have been found to be serious medical needs.  See Rivera v. Goord, 119 F. Supp. 2d, 327, 332 (S.D.N.Y. 2000) (holding that the prolonged symptoms of temporomandibular disorder including inter alia facial swelling, pain, migraine headaches, infections, severe burning and impaired vision, and partial hearing loss constituted serious medical need); Linden v. Westchester County, No. 93-CV-8373 (MBM), 1995 WL 686742, at *3 (S.D.N.Y. Nov. 20, 1995) (holding "cuts, bruises, and pain caused by [an] altercation with [a corrections officer] . . . ." alleges a serious medical need); see also Rodriguez v. Mercado, No. 00-CV-8588 (JSR/FM), 2002 WL 1997885, at *8 (S.D.N.Y. Aug. 28, 2002) (holding that, despite a prisoner's contentions of being kneed in the back and struck in the head, a subsequent medical examination revealing no bruises or loss of consciousness did not implicate a serious medical need).

This analysis does not account for the alleged sore ribs and labored breathing Douglas also suffered.  Clearly, difficulty breathing may constitute a serious medical concern which both the reasonable person and physician would agree required treatment.  While there is no evidence in the record on the effects on Douglas' daily activities,  the inability to breathe, compounded by Douglas' underlying respiratory problem,[8] supports Douglas' claim that there could be significant impositions on his activities of daily living.  Additionally, there is evidence that Douglas' injuries and subsequent pain in his torso were sufficiently serious to necessitate additional sick calls.  Douglas Dep. at 79-80.

Douglas also claims to have suffered severe psychological trauma from the June 30th

_____

[8] In Douglas' sealed medical records which are on file with the Court, there are thirteen entries between June 29, 2004 and July 7, 2005 where Douglas made complaints for symptoms related to his sarcoidosis.

14

altercation. "Treatment of mental disorders of mentally disturbed inmates is . . . a serious medical need" as contemplated by Estelle. Guglielmoni v. Alexander, 583 F. Supp. 821, 826 (D. Conn. 1984). Thus, considering Douglas' various medical complaints together, it appears clear that he has raised a question of material fact whether he suffered a serious medical need as a result of this altercation.

However, even if Douglas suffered from a serious medical need, it cannot be said that defendants were deliberately indifferent to his needs. After the altercation, defendants immediately attended to Douglas' bruises and superficial abrasions by providing an ice pack and a follow-up examination. Douglas Dep. at 75-77. For the persistent pain, Douglas was provided with pain medication. Id. at 79-80. Thus, defendants did not delay or ignore Douglas' treatment needs.

Additionally, despite his current allegations, after Douglas was provided with pain medication for two weeks, he ceased complaining of the bruises, swelling, and hearing difficulties. Skies Aff. ¶ 10. Moreover, while Douglas did make additional complaints concerning sore ribs and shortness of breath, the medical record is replete with instances of medical personnel, including specialists, concluding that Douglas' breathing was unobstructed and that he was without respiratory distress. Thus, Douglas' current conclusory assertions that he received inadequate medical attention, absent other documentation, fails to constitute evidence sufficient to raise issues of fact. See Williams v. Coughlin, 650 F. Supp. 955, 957 (S.D.N.Y. 1997) (granting summary judgment where "plaintiff's affidavit and deposition . . . [did] not contain facts involving manifestations of . . .deliberate indifference. . . .").

Lastly, there is no evidence that treatment for mental trauma was indicated for Douglas.

Although Douglas never approached the medical staff for a referral, he testified to speaking informally to therapists as they made their rounds through the SHU.  Douglas Dep. at 80. Each professional that Douglas spoke with agreed that he did not require mental health services.  Id. at 80-82.  Therefore, even though Douglas disagrees with the treatment determined necessary by defendants, such disagreement does not rise to the level of a constitutional violation.

Therefore, defendants' motion for summary judgment on this ground should be granted as to Douglas' medical indifference claim from the June 30 altercation.


### ii. August 30th Altercation

Douglas claims that the defendants were also deliberately indifferent to the serious medical needs he presented after the August 30th altercation.  Douglas' injuries included bruises, abrasions, and pain in his head, back, wrist, shoulder, and face.  Defendants contend that there was no deliberate indifference.

As to the first prong of the analysis, Douglas may have offered sufficient evidence to prove that his injuries resulting from the August 30th altercation constituted a serious medical need.  As discussed supra, Douglas' contentions of bruises, abrasions, and swelling, if credited, are sufficiently significant to meet the first prong of the analysis. Additionally, Douglas claims to have sustained a serious shoulder injury.  Other cases suggest that allegations of "severe pain . . . [and] reduced mobility . . ."  in the shoulder are sufficient to raise a material issue of fact as to a serious medical need.  Sereika v. Patel, 411 F. Supp. 2d 397, 406 (S.D.N.Y. 2006).   However, Douglas' claims with respect to his shoulder are conclusory, unsubstantiated, and undocumented.  The only mention of

continued pain and potential surgery occurred during Douglas' deposition.  Douglas has,
therefore, failed to offer sufficient evidence to raise a question of fact as to his claimed
shoulder injury.  Liberally construing the evidence in the light most favorable to Douglas,
however, it could be found that his other injuries as alleged rose to the level of a serious
medical need.

Even if it can be argued that Douglas was suffering from a serious medical need,
though, his claim fails to demonstrate deliberate indifference.  After Douglas was allegedly
assaulted, he received immediate medical attention.  Douglas contends that Skies did not
provide any examination or care.  However, Douglas testified to receiving ice and pain
medication from Skies.  Douglas Dep. at 128; Docket No. 41, attachment 13 at 15-31.  At
most, Douglas may disagree with the course of treatment provided, but mere disagreement
will not suffice to raise a material question of fact.  Thus, defendants did not delay or
preclude Douglas from receiving adequate treatment for his bruises and pain.

Additionally, when Douglas discovered an abrasion on his head the following morning,
he was immediately seen by medical staff, given pain medication, and noted to be alert,
oriented, and to have a normal gait.  Skies Aff. at ¶ 9.  Therefore, even though defendants
did not initially discover the abrasion on his scalp, there is no evidence that the oversight
was intentional.  Once the abrasion was brought to the medical staff's attention, it was
cleansed and Douglas was provided with appropriate pain relief.  Moreover, on his follow-up
visit it was noted that he was walking normally and "presented with no injuries or symptoms
requiring any further medical care or treatment at that time."  Id.

Furthermore, defendants cannot be accused of intentionally delaying or denying
treatment for Douglas' alleged shoulder injury because, until the date of his deposition, the

17

alleged rotator cuff tear was not disclosed by Douglas to medical personnel and his physical appearance gave medical staff no indication that there was any problem.  Additionally, Douglas had ample opportunity to notify defendants of his shoulder pain because he was seen by the medical staff eleven times between the date of the altercation and the filing of the present litigation. Therefore, Douglas has failed to set forth facts sufficient to establish the deliberate indifference of the prison officials because his summary conclusions, absent any other documentation, are inadequate to substantiate his Eighth Amendment claims here.

Therefore, defendants' motion for summary judgment on this ground should be granted as to Douglas' claim regarding injuries allegedly suffered in the August 30 altercation.


**iii. Sarcoidosis**

Douglas claims that defendants were deliberately indifferent to the serious medical need from his sarcoidosis because they did not adequately clean his living quarters.  Defendants contend that there was no deliberate indifference.

As to the first prong of the analysis, it is clear that Douglas suffered from a serious medical need.  While there are no cases directly on point, in environmental tobacco smoke ("ETS") or second-hand smoke cases, sarcoidosis has been found to constitute a serious medical need.  Lyerly v. Koenigsmann, No. 04-CV-3904 (PKC), 2006 WL 1997709, at *5 (S.D.N.Y. July 17, 2006).  Additionally, in ETS cases, symptoms of severe headaches, eye irritation, and difficulty breathing have been found sufficient to constitute a serious medical need.  See Koehl v. Greene, No. 06-CV-0478 (LEK/GHL), 2007 WL 2846905, at *16 (N.D.N.Y. Sept. 26, 2007). Furthermore, asthma, in varying degrees of severity, has also

18

been determined to be a serious medical condition.  See Bost v. Bockelmann, 2007 WL 527320, at *9 (N.D.N.Y. Feb. 20, 2007) (holding that "with plaintiff being given the benefit of every inference . . . ." asthma is a serious medical condition); Flemming v. Velardi, No. 02-CV-4113 (AKH), 2003 WL 21756108, at *2 (S.D.N.Y. July 30, 2003) ("Difficulty breathing due to asthma may be a serious medical condition, depending on the severity of the asthma attack."); Patterson v. Lilley, No. 02-CV-6056 (NRB), 2003 WL 21507345, at *4 (S.D.N.Y. June 30, 2003) (concluding that "asthma was not sufficiently serious to warrant Eighth Amendment protection in the absence of an attack or symptoms of an attack.").

However, even with Douglas' sarcoidosis and associated headaches, eye problems, and leg and foot pain, there is absent sufficient evidence that defendants were deliberately indifferent to his medical needs.  Douglas had twelve documented instances in his ambulatory health report of complaints due to sarcoidosis or its associated symptoms, but defendants treated Douglas, including a pulmonary function test, pulmonary consult, and a chest X-ray.

Furthermore, Douglas was not denied treatment as the diagnostic tests revealed that his lungs were stable and clear.  Additionally, at each sick call, including those that were not premised on shortness of breath or pain, Douglas' lungs were checked and were clear. Some entries in his medical records also include notations commenting on the lack of wheezing and respiratory distress.  Moreover, Douglas was provided with an inhaler for acute problems.  Therefore, diagnostic testing indicated that Douglas was not in distress. On this record, there is no question of fact that defendants did not deny Douglas adequate treatment.  Moreover, when Douglas submitted a grievance about his living conditions, defendants responded to and investigated his concerns.  Thus, as before, the conclusory

19

assertions that Douglas received inadequate and indifferent medical care for his respiratory condition do not raise a question of fact as to the element of deliberate indifference.  See Williams, 650 F. Supp. at 957.

Therefore, defendants' motion for summary judgment on this ground should be granted.

### 2. Excessive Force

The Supreme Court has established that inmates enjoy Eighth Amendment protection against the use of excessive force and may recover damages for its violation under 42 U.S.C. § 1983.  Hudson v. McMillian, 503 U.S. 1, 9-10 (1992).  The Eighth Amendment's prohibition against cruel and unusual punishment precludes the "unnecessary and wanton infliction of pain."  Gregg v. Georgia, 428 U.S. 153, 173 (1976); Sims v. Artuz, 230 F.3d 14, 20 (2d Cir. 2000).  To bring a claim of excessive force under the Eighth Amendment, a plaintiff must establish both objective and subjective elements. Blyden v. Mancusi, 186 F.3d 252, 262 (2d Cir. 1999).

The objective element is "responsive to contemporary standards of decency" and requires a showing that "the injury actually inflicted is sufficiently serious to warrant Eighth Amendment protection."  Hudson, 503 U.S. at 9 (internal citations omitted); Blyden, 186 F.3d at 262.  However, "the malicious use of force to cause harm constitute[s] [an] Eighth Amendment violation per se" regardless of the seriousness of the injuries.  Blyden, 186 F.3d at 263 (citing Hudson, 503 U.S. at 9).  "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind."  Hudson, 503 U.S. at 9-10 (citations omitted).  "'Not every push or

shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.'" Sims, 230 F.3d at 22 (citation omitted).

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." Id. at 21 (citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" Id. (quoting Hudson, 503 U.S. at 7).

Here, Douglas claims that on two occasions he was stomped, kicked, and punched during transport to and from his cell. Compl. at ¶¶ 14, 17-19. Douglas sustained bruises and abrasions as a result of both altercations and claims to have suffered psychological trauma from the first assault and a torn rotator cuff potentially requiring surgery from the second assault. Douglas Dep. at 78, 133-34; Skies Aff. at ¶ 5; Docket No. 41, attachment 13 at 1; Docket No. 41, attachment 12 at 80. Moreover, Douglas claims to have been assaulted, at times by multiple officers, while in restraints. Douglas Dep. at 46-47, 71, 78, 108-10, 114, 119. Such evidence suffices to raises questions of fact as to the good faith of the officers involved. Additionally, inflicting such a purported amount of force and pain presents a question of fact sufficient to withstand a motion for summary judgment.

Accordingly, it is recommended that defendants' motion on this ground be denied.

### 3. Qualified Immunity

___Defendants also contend that they are entitled to qualified immunity.[9]  Qualified

---

[9]Qualified immunity is sought on this claim for defendants Smith and Skies in relation to the Eighth Amendment claims.

immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Aiken v. Nixon, 236 F. Supp. 2d 211, 229-30 (N.D.N.Y. 2002) (McAvoy, J.), aff'd, 80 Fed.Appx. 146 (2d Cir. Nov. 10, 2003). However, even if the constitutional privileges "are clearly established, a government actor may still be shielded by qualified immunity if it was objectively reasonable for the . . . official to believe that his [or her] acts did not violate those rights." Smith v. City of Albany, No. 03-CV-1157, 2006 WL 839525 *16 (N.D.N.Y. Mar. 27, 2006) (quoting Kaminsky v. Rosenblum, 929 F.2d 922, 925 (2d Cir. 1991); Magnotti v. Kuntz, 918 F.2d 364, 367 (2d Cir. 1990) (internal citations omitted)). A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation. Saucier v. Katz, 533 U.S. 194, 201 (2001). Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation. Aiken, 236 F. Supp. 2d at 230.

Here, in the case of Skies, the second prong of the inquiry need not be reached because, as discussed supra, accepting all of Douglas' allegations as true, he has not shown that Skies violated his constitutional rights.

However, in the case of Smith, the second prong of the inquiry need be met because there was a potential violation of Douglas' Eighth Amendment rights with respect to the excessive force claims. It cannot reasonably be said that the Superintendent of a correctional facility was unaware of a prisoner's right to be free from the application of excessive force. Thus, questions of fact as to both prongs of Smith's assertion of qualified immunity preclude grant of such immunity on this motion.

22

Therefore, it is recommended that defendants' motion on this ground be granted as to Skies and denied as to Smith.

### D. Mail Tampering

Liberally construing Douglas' claims, he asserts a First and Fourth Amendment claim concerning the unconstitutional interception and examination of his mail.  Additionally, Douglas states another First Amendment claim for denial of access to the courts when his mail was tampered with and sent to a District Attorney without his permission.  Defendants claim that Douglas has failed to state a First Amendment claim.

### 1. Mail Watch

An action commenced pursuant to 42 U.S.C. § 1983 requires the "deprivation of any right[], privilege[], or immunit[y] secured by the Constitution" or laws of the federal government.  42 U.S.C. § 1983.  Thus, no action lies under § 1983 unless a plaintiff has asserted the violation of a federal right.  See Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n, 453 U.S. 1, 19 (1981).  Interception of a prisoner's mail has been analyzed under both the First and Fourth Amendment.  United States v. Felipe, 148 F.3d 101, 108 (2d Cir. 1998).  "'[C]onvicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison,'" but "it must be recognized that a prisoner's constitutional rights are limited by the legitimate penological needs of the prison system".  Felipe, 148 F.3d at 107 (quoting Bell v. Wolfish, 441 U.S. 520, 545 (1979)).  The Supreme Court has held "that the interception of a defendant's prison correspondence does

not violate that individual's First or Fourth Amendment rights if prison officials had 'good' or 'reasonable' cause to inspect the mail."  Id. at 108 (citing United States v. Workman, 80 F.3d 688, 698-99 (2d Cir. 1996) (applying Turner and its progeny to conclude "that - at least where prison officials have reasonable cause for suspicion - surveillance of inmate mail is unobjectionable under the [First and] Fourth Amendment[s].").

   In this case, construing Douglas' claims liberally, he contends that the "tampering" of his mail through his mail watch[10] was unconstitutional.  Due to the June 30th altercation, Douglas "was placed on a mail watch [by defendants] . . . in an attempt to investigate whether the June 30th assault was a planned attack, whether it was possibly gang affiliated, and whether other attacks against staff might be anticipated."  Smith Aff. at ¶ 9.  While Douglas disputes the identity of the aggressor in the altercation, he did subsequently plead guilty to assaulting defendant Rae.  People v. Douglas, 831 N.Y.S.2d 585 (3d Dep't 2007).  Thus, even if Douglas' assertions are true, the altercation and initial admission of guilt gave defendants good and reasonable cause to inspect Douglas' outgoing mail in order to protect other corrections officers and prisoners.  Therefore, on this record, defendants did not violate Douglas' rights as their penological interests outweighed Douglas' constitutional rights.

   Thus, defendants' motion for summary judgment should be granted for Douglas' failure to state a claim concerning First and Fourth Amendment violations for his mail watch.

---------------

   [10]Mail watch "allow[s] a prison superintendent to authorize the inspection of outgoing and incoming mail if there is reason to believe that the correspondence threatens the safety of any person or the good order of the facility."  Felipe, 148 F.3d at 105.

## 2. Denial of Access to Courts

"Interference with legal mail implicates a prison inmate's rights to access to the courts and free speech as guaranteed by the First and Fourteenth Amendments to the U.S. Constitution." Davis v. Goord, 320 F.3d 346, 351 (2d Cir. 2003). In order to state a claim of denial of access to the courts, including those premised on interference with legal mail, a plaintiff must allege "that a defendant caused 'actual injury,' i.e. took or was responsible for actions that 'hindered [a plaintiff's] efforts to pursue a legal claim.'" Id. (citing Monsky v. Moraghan, 127 F.3d 243, 247 (2d Cir. 1997) (quoting Lewis v. Casey, 518 U.S. 343, 351 (1996)). "[A]n isolated incident of mail tampering is usually insufficient to establish a constitutional violation . . . . Rather, the inmate must show that prison officials regularly and unjustifiably interfered with the incoming legal mail." Id. (citations omitted); see also Washington v. James, 782 F.2d 1134, 1139 (2d Cir. 1986) (explaining that an action may not give rise to damages if there was "no showing . . . that the inmate's right of access to the courts was chilled or the legal representation was impaired."); Morgan v. Montanye 516 F.2d 1367, 1371 (2d Cir. 1975) (holding that a single instance of mail tampering which did not lead the plaintiff to suffer any damage was insufficient to support a constitutional challenge).

Douglas contends that a letter he wrote, on behalf of another inmate, Corey Ford, was intercepted and sent to the Dutchess County District Attorney. Douglas Dep. at 139. The District Attorney allegedly attempted to introduce the information contained in the intercepted letter during Ford's trial. Id. However, the trial judge precluded the introduction of the evidence. Id. Even construing every alleged fact in Douglas' favor, a constitutional challenge has not been substantiated. First, Douglas has failed to show a regular and

unjustifiable pattern of interference because this was the only incident of alleged mail tampering which Douglas has identified.  During his deposition, Douglas offered additional conclusory statements concerning defendant Rae and alleged mail tampering, but they lacked specificity and detail.  These statements, without more, are insufficient to raise an issue of material fact as to the prevalence of defendants' alleged interference.  Thus, this isolated incident is insufficient to support a First Amendment claim.

Additionally, Douglas suffered no injury from the alleged isolated incident of tampering. First, the information was used against a third party.  This was unsuccessful because any information gleaned from the letter was precluded by the trial judge.  Thus, the information was not disseminated and did not have any effect on Ford.  More importantly, the interception of the Ford letter impaired no legal proceeding in which Douglas was a party. The standard which Douglas must satisfy here concerns harm to Douglas due to defendants actions and not the harm to a third party associated with Douglas.

Therefore, defendants' motion for summary judgment on this ground should be granted.


### E. False Misbehavior Report

Douglas contends that "[d]efendants . . . Smith [and] . . . Rae . . . utiliz[ed] the disciplinary administration hearings to subject Douglas to punitive segregation when Douglas has not violated any rules or regulations."  Compl. at ¶ 37.  Defendants contend that Douglas has failed to state a due process claim and, in the alternative, has not asserted a retaliation claim.

26

### 1. Due Process

An inmate asserting a violation of his or her right to due process must establish the existence of a protected interest in life, liberty, or property. See Perry v. McDonald, 280 F.3d 159, 173 (2d Cir. 2001).  "Prisoners enjoy the right not to be deprived of life, liberty or property without due process of law, but their rights are to be balanced with, and often tempered by, the needs of their special institutional setting."  Malik v. Tanner, 697 F. Supp 1294, 1301 (S.D.N.Y. 1988) (citing Wolff v. McDonnell, 418 U.S. 539, 556 (1974)).  "When restrictive confinement within a prison is expressly imposed as a disciplinary sanction . . . , there will ordinarily be no doubt that the confinement impaired a liberty interest . . . and that [] due process procedures . . . are required."  Sher v. Coughlin, 739 F.2d 77, 81 (2d Cir. 1984); see also McCann v. Coughlin, 698 F.2d 112, 121 (2d Cir. 1983) (holding "that an inmate who is or may be sentenced to a term of confinement in a Special Housing Unit has a right to the procedural protections of the Due Process Clause.").

A "prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest."  Freeman v. Rideout, 808 F.2d 949, 951 (2d Cir. 1986)).  "There must be more, such as retaliation against the prisoner for exercising a constitutional right."  Boddie v. Schnieder, 105 F.3d 857, 862 (2d Cir. 1997) (citing Franco v. Kelly, 854 F.2d 584, 588-90 (2d Cir. 1988)).

Moreover, Douglas claim here runs afoul of the "favorable termination rule of Heck v. Humphrey, 512 U.S. 477, 487-87 (1994).  That rule provides that if a determination favorable to the plaintiff in a § 1983 action "would necessarily imply the invalidity of his conviction or sentence," a plaintiff must prove that the conviction or sentence has been

reversed on direct appeal or declared invalid in order to recover damages under § 1983. This rule apples to challenges to procedures used in prison disciplinary proceedings. Edwards. v. Balisok, 520 U.S. 641 (1997).  There is no evidence that Douglas' criminal conviction was ever vacated.  Therefore, because his recovery of damages here for a false misbehavior report would necessarily imply the invalidity of that conviction, his claim here cannot stand.  Defendants' motion as to the false misbehavior report claim should be granted.

## 2. Retaliation

Liberally construing Douglas' claim, it appears that he attempted to assert a claim for retaliation against defendants Rae and Smith.  In order to state an actionable claim for retaliation, a plaintiff must first allege that the plaintiff's conduct was constitutionally protected and that this protected conduct was a substantial factor that caused the adverse action against plaintiff.  Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996).  However, courts must view retaliation claims with care and skepticism to avoid judicial intrusion into prison administration matters. Id.  Conclusory allegations alone are insufficient. Id. (citing Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir. 1983) (explaining that "claim[s] supported by specific and detailed factual allegations . . . ought usually be pursued with full discovery.")).

Here, there is no question that Douglas' conduct in filing grievances and appeals therefrom was conduct protected by the First Amendment.  However, Douglas has failed to allege or offer facts from which one could conclude that defendants' actions were motivated by Douglas' constitutionally protected activities.  Douglas' contentions fail to state an actionable retaliation claim.

28

Therefore, it is recommended that defendants' motion on this ground be granted as to Douglas' claims for both due process violation and retaliation.


### F. Personal Involvement

Defendants contend that Douglas failed to establish the supervisory liability of defendant Smith, the Superintendent at Shawangunk.

"'[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (quoting Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991)).  Thus, supervisory officials may not be held liable merely because they held a position of authority. Id.; Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996).  However, supervisory personnel may be considered "personally involved" if:

> (1) [T]he defendant participated directly in the alleged constitutional violation;
>
> (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;
>
> (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;
>
> (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or
>
> (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (citing Williams v. Smith, 781 F.2d 319, 323-24 (2d Cir. 1986)).

Douglas alleges that Smith was personally involved because he was the direct

29

supervisor to all other defendants, had imputed knowledge of their actions, and failed to train officers properly by providing anger management classes.  Douglas Dep. at 147-48. As discussed above, Smith cannot be liable solely because he held a position of authority over other defendants.  Additionally, Smith "was not present during the alleged assaults on [Douglas] by staff and [has] no first hand knowledge of either . . . incident . . . ." Smith Aff. at ¶ 6.  Thus, it is impossible to place liability on him for being directly involved.

Moreover, there are no indications that Smith created an unconstitutional policy or custom or was grossly negligent in supervising.  Douglas makes conclusory and unsubstantiated statements about an alleged policy which transfers inmates out of a correctional facility once they have a conflict with a corrections officer.  Douglas Dep. at 148-49.  However, "[c]ontrary to [Douglas'] claim, there is no such policy; otherwise, any inmate could compel their own transfer out of a particular facility simply by assaulting an officer.  Such a policy would be untenable in a prison setting and compromise prison security and safety."  Smith Aff. at ¶ 10.  Moreover, prison movement orders are a collaborative process and determined pursuant to DOCS guidelines, DOCS' Office of Classification and Movement, and security staff and guidance counseling.  Id.  Thus, Douglas' conclusory statements, without something more to controvert the record, are insufficient to dispute defendant's expertise.

Douglas also asserts that Smith should have instituted anger management classes; however, personal involvement concerns the existence of unconstitutional policies and not the desire for implementation of additional constitutional policies.  This assertion could be construed as a complaint of negligent supervision.  However, the record is undisputed that each time Douglas filed a grievance, an investigation was commenced and a hearing held.

30

Therefore, it is recommended that defendants' motion for summary judgment on this ground be granted.

### III.  Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that:

A.  Defendants' motion for summary judgment (Docket No. 41) be:

1.  **GRANTED** in all respects as to Douglas' First Amendment claims for mail tampering and retaliation;

2.  **GRANTED** in all respects as to Douglas' Fourth Amendment claim for mail tampering;

3.  **GRANTED** in all respects as to Douglas' Eighth Amendment claims for deliberate indifference to medical needs;

3. **DENIED** in all respects as to Douglas' Eighth Amendment claims for excessive force;

4. **GRANTED** in all respects as to Douglas' Fourteenth Amendment claims for denial of due process; and

5. **GRANTED** in all respects as to defendant Smith's lack of lack of personal involvement; and

**IT IS FURTHER RECOMMENDED** that the complaint be **DISMISSED** without prejudice as to defendant Davies pursuant to Fed. R. Civ. P. 4(m).

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO**

**OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE**

**REVIEW.**  Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Small v. Sec'y of HHS, 892

F.2d 15 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).


Dated:  January 22, 2008
        Albany, New York

_____
United States Magistrate Judge